# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Harriet M. Liedtke, | Case No. 15-cv-3361 (JRT/HB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Ria Runningen, Timberland Partners, City of Burnsville, Matthew Smith, Fairview Health Services, Dakota County, Angela Elwell, and Joe Dalager, | |
| Defendants. | |

Harriet Liedtke, 15151 Green Haven Drive, Apt. 124, Burnsville, MN 55306, pro se

Brooke C. Nelson and Malcolm P. Terry, Bernick Lifson, P.A., 5500 Wayzata Blvd, Suite 1200, Minneapolis, MN 55416, for Timberland Partners

Ryan M. Zipf, League of Minnesota Cities, 145 University Avenue West, St. Paul, MN 55103, for City of Burnsville and Matthew Smith

Helen R. Brosnahan and Jeffrey A. Timmerman, Dakota County Attorney's Office, 1560 Highway 55, Hastings, MN 55033, for Dakota County and Angela Elwell

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Dakota County and Angela Elwell's (Dakota County Defendants) Motion to Dismiss [Doc. No. 52]; Defendants Matthew Smith and the City of Burnsville's (Burnsville Defendants) Motion to Dismiss [Doc. No. 81] and Motion to Strike [Doc. No. 85]; and Timberland Partners' Motion to Dismiss [Doc.

No. 90].  These motions were referred to the undersigned for a Report and

Recommendation under 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a)

[Doc. No. 154].[1]  The Court held a hearing on these motions on January 7, 2016.  For the

reasons set forth below, the Court recommends granting the three motions to dismiss and

the Burnsville Defendants' motion to strike.

I.      **BACKGROUND**

Plaintiff Harriet Liedtke, acting pro se, initiated this action by filing a complaint

on August 25, 2015, raising numerous claims under both federal and state law.  (Compl.

[Doc. No. 1].)  In her Amended Complaint, filed September 18, 2015,[2] Plaintiff describes

claims arising from disputes with her neighbor and landlord, incidents involving the

Burnsville Police Department, and legal and medical malpractice claims based on a series

of civil commitment proceedings in Dakota County.  (Am. Compl. [Doc. No. 14].)

Plaintiff alleges numerous state and federal violations, and sues pursuant to 42 U.S.C.

---

[1] Although the Burnsville Defendants' Motion to Strike [Doc. No. 85] could be characterized as a nondispositive motion, the issues are intertwined with issues raised in their Motion to Dismiss; accordingly, the Court addresses both motions in this Report and Recommendation.

[2] This Amended Complaint is the operative complaint.  Plaintiff filed a Second Amended Complaint on November 30, 2015 [Doc. No. 141].  Numerous Defendants moved to strike the Second Amended Complaint, and the Court granted those motions on January 7, 2016 [Doc. No. 189].  As the Court stated during the January 7, 2016, hearing, Plaintiff may not file a second amended complaint as a matter of right.  Instead, she must file a motion seeking to do so in accordance with the Federal Rules and Local Rules, to which the other parties would be entitled to respond.

§ 1983 and "RICO 18 USC §§ 1961-1968." (*Id.* at p. 1.)[3]  Plaintiff demands both

equitable and monetary relief.

### A.  Factual Allegations

Plaintiff's Amended Complaint totals sixty-nine pages and is difficult to decipher,

but the relevant allegations appear to be as follows.  Plaintiff rented an apartment from

Defendant Timberland Partners in Dakota County, Minnesota.  (*Id.* at p. 2 ¶¶ 3, 5.)

Plaintiff had several noise and other disturbance disputes with her neighbor, Defendant

Runningen, whom Plaintiff accuses of running an illegal manufacturing business in her

apartment.[4]  (*Id.* at pp. 3-8 ¶¶ 1-23.)  The Amended Complaint contains a number of

allegations involving Runningen, but of greatest moment to the motions currently before

the Court, Plaintiff alleges Runningen had been hammering in her upstairs apartment for

two days, making shelving units.  (*Id.* at p. 4 ¶ 13.)  On August 29, 2013, at about 5:35

p.m., in response to Runningen's hammering, Plaintiff sat in a folding chair and began

"hammering rhythmically" on Runningen's door.  (*Id.* at p. 4 ¶ 13; p. 10 ¶¶ 8-9).  When

Runningen opened the door and saw Plaintiff, she immediately closed her door.  (*Id.*)

Plaintiff told Runningen, "I owe you two more days of hammering."  (*Id.*)  The Amended

Complaint goes on to allege that Plaintiff continued rhythmically hammering on

Runningen's door until approximately 5:45 p.m.  (*Id.* at p. 10 ¶¶ 8-10).  Runningen called

911 and reported that when Runningen answered her door, Plaintiff was standing there

---

[3] Plaintiff numbered her paragraphs, but restarted numbering for each Defendant.  For clarity, the Court cites to both page and paragraph numbers in the Amended Complaint.

[4] The Amended Complaint also seeks relief against Runningen, but those claims are not the subject of the motions addressed in this Report and Recommendation.

with a raised hammer aimed at her head and swung the hammer, hitting the door to one side of Runningen's head.  (*Id.* at p. 5 ¶ 15.)  Runningen reported Plaintiff had "mental problems" and she feared Plaintiff was going to hit her with the hammer.  (*Id.*)

Burnsville City Police Sergeant Smith (a named defendant) and Officer Hasselman responded to Runningen's 911 call.  (*Id.* at p. 33 ¶ 4; p. 36 ¶ 18.)  The Amended Complaint acknowledges Plaintiff had been hammering on Runningen's door, but alleges Sergeant Smith and Officer Hasselman "should not have believed Runningen about being threatened with a hammer."  (*Id.* at p. 35 ¶ 9.)  Sergeant Smith and Officer Hasselman confronted Plaintiff, who by then had apparently returned to her own apartment.  (*Id.* at pp. 36-37 ¶ 18.)  Plaintiff alleges Sergeant Smith and Officer Hasselman acted in a hostile and disrespectful nature towards her by calling her by her first name and refusing to accept her offers of earplugs, bug spray, and coats that she described as "collateral" that showed her willingness to speak with them.  (*Id.* at pp. 37-38 ¶¶ 21-23).  Plaintiff further alleges that Defendant Smith rammed her against a wall in her apartment (*id.* at p. 38 ¶ 24), misapplied handcuffs on her, retaliated by applying quadruple handcuffs after she removed one of her hands from the handcuffs, and repeatedly readjusted the four-point restraints despite her screams of pain.  (*Id.* at p. 25 ¶ 22; p. 40 ¶ 27.)  Sergeant Smith subsequently completed an incident report and stated Plaintiff was "agitated," although Plaintiff states she was not agitated "until after police attacked her."  (*Id.* at p. 42 ¶ 33.)  Sergeant Smith took Plaintiff into custody and transported her to Defendant Fairview Health Services for an emergency medical hold under Minnesota Statute § 253B.05 on the ground of mental instability.  (*Id.* at p. 25 ¶ 20; p. 42 ¶ 32).  Plaintiff

alleges that police acted on false information and should not have relied on Runningen's report to conclude that she had threatened Runningen; in sum, although not explicitly stated, the pleading (when construed liberally) appears to allege that they did not have a legitimate reason to take her into custody, and that Smith used excessive force in doing so.  (*Id.* at pp. 33-35 ¶¶ 4-11.)

In addition to claiming that Burnsville police wrongfully seized her, Plaintiff alleges they filed false reports that resulted in her civil commitment (*see, e.g.*, *id.* at p. 24 ¶ 15; p. 25 ¶¶ 18-21), and that they failed to investigate and arrest Runningen (*id.* at pp. 21-22 ¶¶ 7-9).  She accuses Smith of subsequently returning to her apartment building and engaging in indecent sexual conduct in police vehicles in order to harass and retaliate against her.  (*Id.* at pp. 26-28 ¶¶ 28-32.)  She also alleges the City facilitates lawlessness through policy, custom, and practice.  (*Id.* at p. 19 ¶ 1.)  In addition, Plaintiff accuses the City of spoliation (*id.* at pp. 20-21 ¶ 6), defamation (*see, e.g.*, *id.* at p. 24 ¶¶ 15, 17), and violations of the Minnesota Government Data Practices Act (*see, e.g.*, *id.* at p. 28 ¶ 36; p. 29 ¶ 38; pp. 31-32 ¶¶ 46-49).

A Fairview doctor, Dr. Dennis Philander, examined Plaintiff and diagnosed her on August 30, 2013, as suffering from delusional paranoia.  (*Id.* at p. 45 ¶ 1; p. 47 ¶ 12; p. 50 ¶ 28).  Fairview institutionalized Plaintiff for delusions.  (*Id.* at p. 45 ¶ 3.)  Plaintiff was subsequently re-institutionalized, as described below.[5]  (*Id.* at p. 51 ¶ 35.)  Defendant

---

[5] The Dakota County Defendants submitted the court orders from Plaintiff's civil commitment proceedings.  The orders state Plaintiff was placed on emergency medical hold, and on September 4, 2013, Defendant Fairview filed a petition seeking to civilly commit her; that same day, Dakota County Judge David L. Knutson ordered her to be

Elwell, a Dakota County social services worker, reported Plaintiff had made a statement to her during a meeting on September 24, 2013, that Plaintiff had stockpiled fertilizer and alarm clocks in her apartment to blow it up when she moves out and to shoot police from the laundry room window with an AK-47 when they show up to investigate. (*Id.* at pp. 60-61 ¶¶ 3-4.) On September 25, 2013, Plaintiff was again judicially committed by a judge from the Dakota County District Court. (*Id.* at p. 56 ¶ 11.) She was released sometime later, but then committed again on January 7, 2014. (*Id.* at p. 57 ¶ 14.) Plaintiff's claims against Elwell arise out of her September 2013 and January 2014 commitments.[6] (*Id.* at pp. 56-58 ¶¶ 11-15; pp. 60-64 ¶¶ 1-12.) She accuses Elwell of falsifying records and falsely testifying during her civil commitment hearings. (*Id.* at pp. 60-65 ¶¶ 2-4, 8-10, 12.) Plaintiff also accuses Dakota County of failing to supervise and train Elwell, among other complaints. (*Id.* at pp. 56-57 ¶¶ 11-12.)

---

committed at Fairview pending a preliminary probable cause hearing. (Timmerman Suppl. Aff. Ex. 3 (Order, *In re Civ. Commitment of: Harriet M. Liedtke*, Case No. 19HA-PR-13-624 (Minn. Dist. Ct. Sept. 4, 2013)) [Doc. No. 129].) At a final hearing on September 12, 2013, Dakota County Judge Tim D. Wermager provisionally discharged her from commitment provided she satisfied certain court-ordered conditions. (Timmerman Suppl. Aff. Ex. 5 (Findings of Fact, Concls. of Law & Order, *In re Liedtke*, Case No. 19HA-PR-13-624 (Minn. Dist. Ct. Sept. 12, 2013)) [Doc. No. 129].) The Court may consider these materials as matters of public record and as matters embraced by the Amended Complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (citations omitted).

[6] Plaintiff also asserts medical malpractice claims against Fairview, alleging that doctors did not listen to her and did not properly examine her. (Am. Compl. at pp. 45-54 ¶¶ 1-53.) In addition, she asserts legal malpractice claims against Defendant Dalager, who was her assigned attorney during the civil commitment proceedings, on the grounds that he provided inadequate representation by, among other things, failing to investigate and failing to appeal. (*Id.* at pp. 65-67 ¶¶ 1-14.) Those claims are the subject of separate motions and are not addressed in this Report and Recommendation.

Plaintiff's Amended Complaint also contains allegations against her landlord Timberland Partners, with whom she has a history of engagement in multiple rent escrow actions.  (*Id.* at pp. 12-13 ¶¶ 15-20.)  Many of these allegations arise out of Plaintiff's disputes with Runningen.  (*Id.* at pp. 9-12 ¶¶ 3-14; pp. 14-19 ¶¶ 3-14.)  Plaintiff claims Timberland has violated both city ordinances and Minnesota statutes relating to habitability.  (*Id.* at pp. 11-18 ¶¶ 13-35.)

### B.  Plaintiff's Claims and Relief Requested

While the specific legal grounds for Plaintiff's claims are not always clear, she cites 42 U.S.C. § 1983, *City of Canton v. Harris*, 489 U.S. 378 (1989), and *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) as supporting many of her claims.  (*See, e.g.*, Am. Compl. at p. 19 ¶ 1.)  She also alleges civil RICO violations against several Defendants.  (*Id.* at p. 1.)  In addition, she asserts a variety of claims under state and municipal law and states conclusorily that pendent jurisdiction exists over such claims.  (*Id.*)

Plaintiff seeks 100% of Runningen's, Smith's and Elwell's assets and income in perpetuity.  (*Id.* at pp. 68-69.)  She further seeks sanctions and equitable relief against Timberland Partners.  (*Id.* at p. 68.)  Against the City of Burnsville, she seeks immediate correction of any records pertaining to her, disbanding of the Burnsville Police Department, and other relief.  (*Id.*)  Similarly, she seeks to have Fairview correct any medical records pertaining to her.  (*Id.*)  From Dakota County, Fairview, and Dalager, she seeks cooperation to set aside the civil commitment decisions against her.  (*Id.* at pp. 68-

69.)  She also seeks the termination of Elwell's employment by Dakota County.[7]  (*Id.* at p. 68.)

## II.    DISCUSSION

### A.    Dakota County and Angela Elwell's Motion to Dismiss

Defendants Dakota County and Angela Elwell filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  The Dakota County Defendants' first argument is that the Court lacks jurisdiction under the *Rooker-Feldman* doctrine because Plaintiff seeks to invalidate her state court judicial commitment.  Alternatively, they argue Plaintiff has failed to state a claim because the *Heck* doctrine renders her claims premature as her state court judicial commitment has not been overturned.  As to Elwell specifically, Defendants argue Plaintiff has sued Elwell in her official capacity only, but that even if she had been sued in her individual capacity, she is immune from suit under § 1983.  As for claims made against Dakota County or against Elwell in her official capacity, Defendants also argue Plaintiff has not adequately pleaded a *Monell* or *Harris* claim.  Finally, they argue Plaintiff has not adequately pleaded any RICO claims against them.[8]

---

[7] In their memorandum in support of their motion to dismiss, the Dakota County Defendants state Elwell is no longer employed by Dakota County [Doc. 55 at 5].

[8] In her response to Defendants' Motion, Plaintiff states that she is not asserting RICO claims against the Dakota County Defendants.  (Pl.'s Mem. Opp'n. Dakota County Mot. Dismiss at 5.)  Accordingly, the Court will not address that issue as to these Defendants.

### 1.       Claims Arising Out of Plaintiff's Civil Commitment

### i.       Rule 12(b)(1) and the *Rooker-Feldman* Doctrine

Federal Rule of Civil Procedure 12(b)(1) provides that a party may move to dismiss a complaint for lack of subject matter jurisdiction.  A party contesting subject matter jurisdiction may mount either a facial challenge or a factual challenge to a court's jurisdiction.  *See Osborn v. United States*, 918 F.2d 724, 729-30 & n.6 (8th Cir. 1990).  On a facial attack, the court limits its consideration to the allegations of the complaint.  *Id.* at 729 & n.6.  On a factual attack, the court may consider matters outside the pleadings without converting the motion to one for summary judgment.  *Id.*  "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.  Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist."  *Id.* at 730.  In determining whether the plaintiff has sustained that burden, a court has the duty to construe liberally a pro se party's pleadings.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  However, "the Court may not supply additional facts or fashion a legal theory that assumes facts that have not been pleaded."  *Benjamin v. Experian Info. Sols., Inc.*, No.  14-cv-810 (JRT/JJG), 2014 WL 3509044, at *2 (D. Minn. July 15, 2014) (citing *Stone v. Harry*, 364 F.3d 912, 914-15 (8th Cir. 2004)).

Here, the Dakota County Defendants raise a factual challenge to subject matter jurisdiction and present materials beyond the pleadings – orders from Plaintiff's civil commitment proceedings – for the Court's consideration.  Specifically, they argue the

Court lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine as to all claims against the Dakota County Defendants arising out of or inextricably intertwined with the civil commitment of Plaintiff because in those claims Plaintiff is essentially requesting that the Court overrule conclusions reached by the state court in her civil commitment proceedings.

Under the *Rooker-Feldman* doctrine, litigants may not bring suit in federal district court "complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Generally, state appellate courts review state-court decisions, with any subsequent federal review limited to the United States Supreme Court under 28 U.S.C. § 1257. Thus, "appellate jurisdiction to reverse or modify a state-court judgment is lodged . . . exclusively in [the Supreme Court]." *Exxon Mobil Corp.*, 544 U.S. at 283. In other words, with the exception of habeas corpus petitions, the federal district courts lack subject matter jurisdiction to review state-court rulings. *Id.* at 292 n.8.

The doctrine applies not only to "the rare case styled as a direct appeal," *Simes v. Huckabee*, 354 F.3d 823, 827 (8th Cir. 2004), but also attempts to litigate different claims that are nevertheless "inextricably intertwined" with the state-court judgment, *District of Col. Ct. of Appeals v. Feldman*, 460 U.S. 462, 482 n.16 (1983).

> Under the *Feldman* doctrine, "the federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongfully decided the issues before it. Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in

substance, anything other than a prohibited appeal of the state-court judgment."

*Keene Corp. v. Cass*, 908 F.2d 293, 296-97 (8th Cir. 1990) (quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25 (1987) (Marshall, J., concurring)).  The doctrine applies even if a plaintiff did not raise its federal claims in the state court action.  *Feldman*, 460 U.S. at 482 n.16 ("By failing to raise his claims in state court a plaintiff may forfeit his right to obtain review of the state-court decision in any federal court.").

In its 2005 *Exxon* decision, the Supreme Court limited and clarified *Rooker-Feldman,* explaining that "*Rooker-Feldman* does not otherwise override or supplant preclusion doctrine . . . ."  *Exxon Mobil Corp.*, 544 U.S. at 284.  The Court stated that there are some circumstances in which a federal court may exercise jurisdiction when a party attempts to litigate in federal court a matter previously litigated in state court.  *Id.* at 293.  For example, "[i]f a federal plaintiff 'presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'"  *Id.* (quoting *GASH Assocs. v. Rosemount*, 995 F.2d 726, 728 (7th Cir. 1993)).

Since *Exxon*, the Eighth Circuit has explained that a district court "is not deprived of jurisdiction over every case in which a plaintiff seeks a result different from the one it obtained in state court.  Rather, *Rooker-Feldman* is implicated in that subset of cases where the losing party in a state court action subsequently complains about that judgment

and seeks review and rejection of it." *Skit Int'l, Ltd. v. DAC Techs. of Ark., Inc.*,

487 F.3d 1154, 1157 (8th Cir. 2007) (internal citations omitted).  Thus,

> [T]here are four requirements for the application of the *Rooker-Feldman* doctrine: (1) the federal court plaintiff must have lost in state court, (2) the plaintiff must complain of injuries caused by a state court judgment, (3) the plaintiff must invite district court review and rejection of that judgment, and (4) the state court judgment must have been rendered before the district court proceedings commenced.

*Christ's Household of Faith v. Ramsey Cty.*, 618 F. Supp. 2d 1040, 1044 (D. Minn. 2009)

(citing *Skit Int'l*, 487 F.3d at 1156-57).

Courts in this district have differentiated between independent claims forming the

basis for the complaint and claims seeking to address an injury caused by the state court

decision itself, holding *Rooker-Feldman* bars only the latter.  *See Peet v. Associated

Bank, N.A. Mendota Heights*, No. 11-cv-2544 (SRN/JJG), 2012 WL 7589401, at *4

(D. Minn. July 20, 2012), *R. & R. adopted*, 2013 WL 717349 (D. Minn. Feb. 27, 2013),

*aff'd*, 556 F. App'x 546 (8th Cir. 2014); *Milliman v. Cty. of Stearns*, No. 05-cv-2993

(JRT/RLE), 2006 WL 2583170, at *12-13 (D. Minn. Sept. 7, 2006).  Moreover, while

*Rooker-Feldman* does not bar claims arising from sources outside the state court

judgment, it bars "a claim seeking redress for an injury caused by the state court decision

itself-even if the basis of the claim was not asserted to the state court."  *Milliman*,

2006 WL 2583170, at *13.

In this case, Plaintiff's action against the Dakota County Defendants is essentially

an appeal of the orders from her civil commitment proceedings.  In many of her papers,

Plaintiff expresses her desire for this federal court litigation to result in setting aside her

civil commitment orders.  Specifically, she states her goal "is to establish a fuse for a set-aside motion in the state court proceedings.  A positive judgment here would be used to approach the experts in the state court proceedings with a request that they recant their testimony based on the new evidence from this litigation."  (Pl.'s Mem. Opp'n Dakota County Mot. Dismiss at 6 [Doc. No. 119].)  Insofar as Plaintiff seeks to use this action against the Dakota County Defendants to have this Court set aside the orders from the civil commitment proceedings, or to get the state court to do so, this Court lacks jurisdiction under *Rooker-Feldman*.

Further, Plaintiff's claims against the Dakota County Defendants are inextricably intertwined with the state court civil commitment orders.  Plaintiff accuses Dakota County of inadequately training Elwell and Elwell of providing inaccurate information to the state court.  Courts around the country have found *Rooker-Feldman* applies to similar claims brought by plaintiffs after being civilly committed.  For example, Rooker-*Feldman* has been held to bar claims that the plaintiff "was injured by the trial court's judgment ordering his civil commitment because the trial court utilized inadmissible evidence."  *Oliver v. Dow*, No. 10-1542 DMC-JAD, 2011 WL 601556, at *10 (D.N.J. Feb. 17, 2011), *R. & R. adopted*, No. CIV. 10-1542 DMC JAD, 2011 WL 3703699 (D.N.J. Aug. 23, 2011).  In another case, the civilly committed plaintiff argued the defendants violated his Sixth, Eighth, and Fourteenth Amendment rights when he was committed after a jury heard untruthful statements regarding his prior criminal record.  *Burr v. Jones*, No. 3:07CV318/MCR/EMT, 2007 WL 2900347, at *1 (N.D. Fla. Oct. 2, 2007).  The court held *Rooker-Feldman* barred his claims and the court could not reverse

13

his civil commitment.  *Id.* at *2.  Similarly, at least one court in this district has held that *Rooker-Feldman* barred an action against law enforcement for providing false information where a state trial court necessarily addressed that issue.  *See Franco v. Minnesota*, No. 12-cv-1706 (ADM/JJG), 2013 WL 2556510, at *7 (D. Minn. June 11, 2013) (noting that a state court judge would have determined whether testimony was false during trial, and declining to "second guess state court decisions").

Here, Plaintiff's alleged injuries at the hands of the Dakota County Defendants arise from the orders in the civil commitment proceedings.  The injuries allegedly caused by inadequate training and false testimony occurred, if at all, when and because she was civilly committed in reliance upon the input of the Defendants.  Accordingly, insofar as Plaintiff seeks to have this Court set aside the orders from the civil commitment proceedings, or to get the state court to do so, *Rooker-Feldman* bars Plaintiff's claims, and the Court recommends dismissal of those claims for lack of subject matter jurisdiction.[9]

### ii.        Alternative Grounds for Dismissal Under Rule 12(b)(6)

On a motion to dismiss brought pursuant to Rule 12(b)(6), "a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant."  *Wong v. Minn. Dep't. of Human Servs.*,

---

[9] Viewing Plaintiff's Amended Complaint liberally, there are some claims – the defamation claim and the MGDPA claim – that neither challenge nor are inextricably intertwined with the state court civil commitment proceedings and to which the *Rooker-Feldman* doctrine would not apply.  The Court addresses those claims in Section II.A.3 and II.A.4 below.

No. 13-cv-3378 (DWF/JSM), 2014 WL 4796464, at *3 (D. Minn. Sept. 26, 2014) (citing

*Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986)).  Generally, in considering a motion

to dismiss under Rule 12(b)(6), the Court considers only the facts alleged in the

complaint.  A court may make exceptions to this rule for "matters of public record,

orders, materials embraced by the complaint, and exhibits attached to the complaint." *Id.*

at *3.  In deciding these motions to dismiss, the Court relies on matters of public record

and other orders.  "To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.*

### (1)   The *Heck* Doctrine

The Dakota County Defendants argue Plaintiff's § 1983 claims fail under Rule

12(b)(6) because the *Heck* doctrine renders them premature.  In *Heck v. Humphrey*,

512 U.S. 477, 478-88 (1994), the Supreme Court stated:

> [I]n order to recover damages for allegedly unconstitutional conviction or
> imprisonment, or for other harm caused by actions whose unlawfulness
> would render a conviction or sentence invalid . . . , [a civil rights] plaintiff
> must prove that the conviction or sentence has been reversed on direct
> appeal, expunged by executive order, declared invalid by a state tribunal
> authorized to make such determination, or called into question by a federal
> court's issuance of a writ of habeas corpus. . . . [T]he district court must
> consider whether a judgment in favor of the plaintiff would necessarily
> imply the invalidity of his conviction or sentence; if it would, the complaint
> must be dismissed unless the plaintiff can demonstrate that the conviction
> or sentence has already been invalidated.

Therefore, under *Heck* and its progeny, a "§ 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit . . . —*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005). *Heck* also applies to civil commitment cases. *See McHorse v. Minnesota*, No. 13-cv-837 (MJD/LIB), 2013 WL 2383603, at *2 (D. Minn. May 30, 2013).

Here, Plaintiff's civil commitment has not been reversed, expunged, or declared invalid. Accordingly, *Heck* precludes any damages under § 1983 for claims based on her allegedly unconstitutional commitment.

### (2)    Failure to Adequately Plead Section 1983 Claims Under *Monell* and *Harris*

The Dakota County Defendants further argue that Plaintiff's Amended Complaint fails to state a claim against Elwell in her individual capacity, and that it fails to state a claim for municipal liability under *Monell* or *Harris*. Under § 1983, public employees may be sued in their official capacities, individual capacities, or both. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). However, where the plaintiff does not specify, the Court presumes that the defendants are being sued in their official capacities only. *Id.* The same is true even when the plaintiff is pro se. *See Taylor v. Roper*, 83 F. App'x 142, 143 (8th Cir. 2003). In *Murphy v. State of Ark.*, 127 F.3d 750, 754-55 (8th Cir. 1997), the Eighth Circuit clearly stated that the individual capacity pleading requirement is to be strictly enforced. The court explained "strict enforcement is required because the Eleventh Amendment presents a jurisdictional limit on federal

courts in civil rights cases against states and their employees." *Id.* (quotation omitted). The Eighth Circuit has also stated "[n]either a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient." *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 619-20 (8th Cir. 1995) (finding the plaintiff did not allege an individual capacity claim even where she named each individual defendant in her complaint by name rather than official position and noted in her response to motions to dismiss that she sued the defendants in their individual capacities).

Plaintiff argues she has sued Elwell and other individual Defendants, including Matthew Smith, in their individual capacities because she included their names rather than their titles in the caption, and because she seeks their personal income and assets, damages that would be unavailable where they are sued only in their official capacities. (Pl.'s Mem. Opp'n Dakota County Mot. Dismiss at 1.) Plaintiff's arguments fail under Eighth Circuit precedent, however. In *Baker v. Chisom*, 501 F.3d 920, 924 (8th Cir. 2007), the plaintiff argued he sued two defendants in their individual capacities because the substantive paragraphs in the complaint referred to the defendants as "individual Defendants" and he prayed for "exemplary damages" that could not have been recovered in an official capacity suit. The Eighth Circuit considered this complaint to be ambiguous regarding capacity, and therefore declined to find the defendants were named in their individual capacities. *Id.* Similarly, Plaintiff here has not unambiguously sued any defendants in their individual capacities. The Court therefore recommends finding that Defendant Elwell was sued in her official capacity only.

When public employees are sued in their official capacities, the lawsuit becomes "an action against an entity of which an officer is an agent."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 n.55 (1978).  The true defendant thus becomes "the governmental entity and not the named official."  *Baker*, 501 F.3d at 925.  A county may be a "person" under § 1983.  *See Scheeler v. City of St. Cloud, Minn.*, 402 F.3d 826, 832 (8th Cir. 2005).  A county may be liable where a plaintiff shows that the county adopted a policy, custom, or practice that violates some federal constitutional right.  *Id.*  Also, under certain circumstances, a municipality's failure to adequately train its employees can be such a policy or custom.  *See City of Canton v. Harris*, 489 U.S. 378, 380 (1989).  The plaintiff need not specifically plead the existence of an unconstitutional policy or custom, but must include allegations, reference, or language so that one can draw an inference of an unconstitutional policy or custom.  *See Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (quotations omitted).  Here, Elwell was employed by Dakota County, and the governmental defendant is therefore Dakota County.  To survive a motion to dismiss, Plaintiff must allege facts sufficient to support a reasonable inference that Dakota County adopted an unconstitutional policy, custom, or practice.

The Dakota County Defendants argue Plaintiff has not adequately pleaded a *Monell* claim.  Specifically, the Dakota County Defendants argue Plaintiff has not adequately pleaded facts to support an inference that a policy or custom violates any constitutional right.  The Dakota County Defendants cite *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013), in support of their argument that Plaintiff has not included

18

any facts from which to infer an unconstitutional policy.  In *Ulrich*, the court granted the defendants' motion to dismiss where a plaintiff conclusorily alleged an unconstitutional policy, but included facts regarding only his own arrest and detention.  *Id.*  The Eighth Circuit stated, "[g]enerally, an isolated incident of alleged police misconduct . . . cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983."  *Id.*

Here, the Court cannot find any facts pleaded by Plaintiff that would allow the Court reasonably to infer an unconstitutional policy or custom.  Plaintiff alleges facts that she argues establish a constitutional violation, but she includes facts relating only to her. Plaintiff simply has not pleaded sufficient facts to infer any unconstitutional policies. For  example, Plaintiff argues Dakota County failed to discipline Elwell for allegedly falsifying county records.  But "[t]he failure of policymakers to discipline subordinates after one isolated incident . . . is not an adequate basis for municipal liability under *Monell*."  *Lollie v. Johnson*, No. 14-cv-4784 (SRN/HB), 2015 WL 3407931, at *7 (D. Minn. May 27, 2015).

Further, for Plaintiff's failure to train claim, she must allege facts that (1) establish that policymakers acted with deliberate indifference in failing to train employees; (2) identify a specific deficiency in the training program; and (3) establish that the deficiency is so "closely related to the ultimate injury" that it "actually caused" the constitutional deprivation.  *Harris*, 489 U.S. at 391; *Ulrich*, 715 F.3d at 1061.  As another court in this district stated, "[i]nferences of inadequate training and causation must be based on more than the mere fact that the alleged constitutional violation occurred in the

first place." *Hahn v. Bauer*, No. 09-cv-2220 (JNE/JJK), 2010 WL 396228, at *12

(D. Minn. Jan. 27, 2010).  Plaintiff has not alleged any facts describing Elwell's training,

let alone facts from which one could infer the training was deficient.  Further, Plaintiff

has not alleged facts from which one could infer any Dakota County policymakers[10]

acted with deliberate indifference in failing to train social workers to work with adults

with mental illness.  Again, Plaintiff has not alleged more than isolated instances that she

argues show a failure to train in violation of her constitutional rights.  Accordingly, even

if this Court had subject matter jurisdiction over Plaintiff's claims against Elwell in her

official capacity (essentially, claims against Dakota County), the Court would

recommend they be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failing

to state a claim upon which relief could be granted.

### (3)    Individual Capacity Claims against Elwell

Although the Court has concluded the Amended Complaint does not name Elwell

in her individual capacity, the Court will address whether, if Plaintiff were allowed to

amend her Amended Complaint, claims against Elwell in her individual capacity would

survive a motion to dismiss.  For the reasons discussed below, the Court would

recommend dismissal of those claims with prejudice because Elwell is entitled to

immunity with regard to any such claims.

---

[10] Insofar as Plaintiff refers to Jennifer Jackson, an assistant county attorney, as a Dakota County policymaker, she is incorrect.  *See Myers v. Becker Cty.*, 833 F. Supp. 1424, 1434 (D. Minn. 1993) (holding assistant county attorneys "lack[] the power to make official policy").

First, as to any claims against Elwell for allegedly providing false testimony during the civil commitment proceedings, Elwell has absolute immunity as a witness. *See Dornheim v. Sholes*, 430 F.3d 919, 925 (8th Cir. 2005) (finding social workers were entitled to absolute immunity for their testimony during child custody hearings).

Second, Elwell has qualified immunity as to any other § 1983 claims against her. "A Rule 12(b)(6) dismissal on qualified immunity is appropriate when the immunity is established on the face of the complaint." *Id.* at 926 (quotation and quotation marks omitted). "Qualified immunity shields a public official from suit for civil damages when his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ulrich*, 715 F.3d at 1058 (quotation omitted). The Eighth Circuit analyzes qualified immunity in two steps: "(1) whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (quotation omitted). A government official is entitled to qualified immunity unless "both of these questions are answered affirmatively." *Id.* (quotation omitted). The Court has discretion which prong "should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236. Thus, when a court concludes that a constitutional right was not violated, it need not address whether the right was clearly established at the time of the alleged violation. *Fields v. Abbott*, 652 F.3d 886, 894 (8th Cir. 2011).

Viewed liberally, the Amended Complaint appears to allege Elwell violated Plaintiff's Fourteenth Amendment procedural and substantive due process rights, and her Fourth Amendment right against unlawful seizure. Plaintiff's procedural due process argument presumably arises from alleged deficiencies in her civil commitment proceedings. "A procedural due process claim is reviewed in two steps. The first question is whether [the plaintiff] has been deprived of a protected liberty or property interest." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006). If a plaintiff does have a protected interest, the court examines what process is due by balancing the specific interest that was affected, the likelihood that the procedures would result in an erroneous deprivation, and the interests in providing the process, "including the administrative costs and burdens of providing additional process." *Id.*

First, Plaintiff has a protected interest against being unconstitutionally committed. *See Drozdik v. City of New York*, No. 01CIV.3300RCCGWG, 2003 WL 366639, at *5 (S.D.N.Y. Feb. 20, 2003) (collecting cases) ("Cases have . . . analyzed involuntary commitment claims as implicating the Fourth Amendment right against unreasonable search and seizure."). However, viewing the allegations in the Amended Complaint and the additional matters embraced by the pleadings in the light most favorable to Plaintiff, it still does not plausibly allege a lack of due process for which Defendant Elwell could be held accountable. Nothing in the Amended Complaint suggests there was a lack of notice or opportunity to offer evidence during her civil commitment proceedings, let alone that Elwell would have had the authority to affect the process. Further, there are no allegations that Elwell had anything to do with Plaintiff's counsel's allegedly inadequate

representation.  Furthermore, it was a state court judge, not Elwell, who civilly committed Plaintiff.  *See In re Civil Commitment of Danforth*, No. A14-0951, 2014 WL 6863320, at *4 (Minn. Ct. App. Dec. 8, 2014), *rev. denied* (Feb. 25, 2015) ("Under the commitment statute . . . [t]he judiciary . . . is ultimately responsible for determining whether to commit an offender.").  The Court thus concludes Plaintiff has not alleged facts plausibly establishing that Elwell violated her constitutional right to procedural due process.

To establish a substantive due process violation under the Fourteenth Amendment, Plaintiff must demonstrate that a fundamental right was violated and that Elwell's conduct shocks the conscience.  *See Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 980 (8th Cir. 2013).  "Mere negligence is never sufficient" to establish whether conduct shocks the conscience.  *Id.* (quoting *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005) (en banc)).  Instead, proof of intent to harm is usually required.  *Id.*

The Eighth Circuit has held that an official may be liable under § 1983 for intentionally or recklessly pursuing an investigation based on false or manufactured evidence in violation of substantive due process.  *Wilson v. Lawrence Cty.*, 260 F.3d 946, 954 (8th Cir. 2001); *White v. Smith*, 696 F.3d 740, 754 (8th Cir. 2012) ("We have recognized that a plaintiff can make out a violation of substantive due process by 'offer[ing] evidence of a purposeful police conspiracy to manufacture, and the manufacture of, false evidence.'"); *Winslow v. Smith*, 696 F.3d 716, 739 (8th Cir. 2012).  But the facts alleged here fall far short of plausibly establishing that Elwell engaged in such a "purposeful conspiracy" or that her conduct in any other respect shocks the

conscience.  Plaintiff complains that Elwell either misunderstood or overlooked

information while investigating Plaintiff's well-being in her role as a social worker.

Elwell's alleged errors are at most negligence.

Furthermore, the Amended Complaint itself provides support for Elwell's

conclusion that Plaintiff should have been civilly committed.  Plaintiff made statements

that she had stockpiled fertilizer and alarm clocks in her apartment to blow it up when she

moved out, and planned to shoot police from the laundry room window with an AK-47

when they showed up to investigate.  Plaintiff argues these statements were meant

sarcastically, and that Elwell wrongly believed them to be true, but it was reasonable for

Elwell to take these threatening statements seriously in her role as Plaintiff's social

worker.  *See Covell v. Smith*, No. CIV. A. 95-501, 1996 WL 750033, at *5 (E.D. Pa. Dec.

30, 1996) (recognizing sarcastic statements about dangerous acts such as starting fires or

deploying bombs in public can provide probable cause for seizure).  "An involuntary

hospitalization . . . passes constitutional muster 'if there are reasonable grounds for

believing the person seized is subject to seizure under the governing legal standard.'"  *Id.*

(quoting *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993) (quoting *Villanova v. Abrams*,

972 F.2d 792, 795 (7th Cir. 1992))).  Plaintiff's own Amended Complaint demonstrates

that there were reasonable grounds for Elwell to believe Plaintiff needed to be civilly

committed.

In sum, even if Plaintiff had sued Elwell in her individual capacity, Elwell would

be entitled to dismissal with prejudice because it is apparent from the face of the

pleadings that she is entitled to qualified immunity on the § 1983 claims and that Plaintiff

has failed to allege plausible grounds for relief on the other claims.

## 2.      Alleged Violations of Minnesota Criminal Statutes

Under Minnesota law, civil liability from violation of a criminal statute only arises

where "the statute expressly or by clear implication so provides."  *Larson v. Dunn*,

460 N.W.2d 39, 47 n.4 (Minn. 1990).  Plaintiff seeks damages against the Dakota County

Defendants for alleged violations of Minnesota Statute § 609.505, subd. 1, which

criminalizes a police officer's actions in making a false report.  She also seeks damages

under Minnesota Statute § 253B.23, subd. 3, in which a person making false reports

resulting in the civil commitment of another may be guilty of a gross misdemeanor.

Neither statute, expressly or by clear implication, provides for civil liability.  Therefore,

even if these claims were not subject to dismissal on *Rooker-Feldman* grounds because

they arise out of the state court civil commitment proceedings, the Court would

recommend dismissal of these claims with prejudice because there is no private cause of

action for violation of these statutes.

## 3.      Claims Under the Minnesota Government Data Practices Act

Plaintiff alleges the Dakota County Defendants violated the Minnesota

Government Data Practices Act (MGDPA).  Plaintiff alleges she has asked for access to

all of the records of Dakota County to correct them, but no one has responded to her

requests.  (Am. Compl. at pp. 58-59 ¶ 17.)  She also states that Dakota County violated

Minnesota Statute § 13.01 by not providing her with all the information on Elwell she requested.  (*Id.* at p. 59 ¶ 18.)

The MGDPA provides that the determination by a responsible authority to not correct data may be appealed only to the Commissioner for the Department of Administration.  Minn. Stat. § 13.04, subd. 4.  There is no indication in the Amended Complaint that Plaintiff did so.  Because she has apparently failed to exhaust her administrative remedies under the MGDPA, the Court would recommend dismissal without prejudice of this claim against the Dakota County Defendants.

As to Plaintiff's claim that Dakota County has not provided her with all the information she requested, the Court must view all facts in favor of Plaintiff.  At this point in litigation, the Court assumes the Dakota County Defendants have not provided Plaintiff existing data in response to her requests.  Nevertheless, for the reasons explained below in Section E, this Court recommends dismissal without prejudice of this claim on the ground that it would not be appropriate to exercise supplemental jurisdiction over this state law claim.

### 4.      Defamation Claims

Plaintiff alleges that the Dakota County Defendants defamed her in reports that Elwell completed.  For example, Plaintiff claims Elwell defamed her by falsely describing Plaintiff's appearance as quite disheveled, while Plaintiff asserts she always dresses in a clean, neat, tidy fashion.  Plaintiff states, "Elwell recorded and conveyed more falsities."  The Dakota County Defendants did not address these claims in their motion to dismiss other than to the extent they are included in the argument that the Court

26

lacks subject matter jurisdiction because any alleged falsity in Elwell's report was necessarily resolved by the state court's decision to commit her. For the sake of completeness, however, and in the event the Dakota County Defendants address these claims in response to any objections by Plaintiff to this Report and Recommendation, the Court does so here.

For a statement to be defamatory, a plaintiff must establish that: (1) the defamatory statement was communicated to someone other than the plaintiff; (2) the statement is false; (3) the statement tends to harm the plaintiff's reputation and lower her in the estimation of the community, and (4) the recipient of the false statement reasonably understands it to refer to a specific individual. *McKee v. Laurion*, 825 N.W.2d 725, 729-30 (Minn. 2013). Regarding the third element, a statement is defamatory "if it causes enough harm to a person's reputation to lower the community's estimation of the individual or to deter others from associating or dealing with the individual." *LeDoux v. Nw. Pub., Inc.*, 521 N.W.2d 59, 68 (Minn. Ct. App. 1994). Additionally, a "plaintiff must plead and prove a defamation claim with a certain degree of specificity, including pleading who made the alleged defamatory statement, to whom the statements were made, and where the statements were made." *Magee v. Trustees of the Hamline Univ.*, 957 F. Supp. 2d 1047, 1060 (D. Minn. 2013), *aff'd*, 747 F.3d 532 (8th Cir. 2014). The plaintiff must also set forth the precise words verbatim. *Id.* (citing *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn. 2000)).

Minnesota recognizes two categories of privilege that exist as a defense against defamation claims-absolute and qualified privilege. *See Zutz v. Nelson*, 788 N.W.2d 58,

27

61 (Minn. 2010). "Absolute and qualified privileges cover statements made by many categories of public officials." *Id.* at 62. "An absolute privilege applies without regard to the intent of the speaker, but a qualified privilege requires a determination of the speaker's mental state." *Id.* "[Q]ualified privilege bars liability only if the 'defamatory statements are publicized in good faith and without malice.'" *Minke v. City of Minneapolis*, 845 N.W.2d 179, 182 (Minn. 2014) (quoting *Matthis v. Kennedy*, 243 Minn. 219, 223, 67 N.W.2d 413, 416 (1954)).

Plaintiff appears to allege Elwell published allegedly defamatory statements to Assistant County Attorney Jennifer Jackson as part of her civil commitment proceedings (Am. Compl. at p. 56 ¶ 11). To the extent she is referring to statements Elwell made in her reports completed in connection with the judicial process, Elwell is entitled to absolute immunity for those reports. *See Mahoney & Hagberg v. Newgard*, 712 N.W.2d 215, 219 (Minn. Ct. App. 2006), *aff'd*, 729 N.W.2d 302 (Minn. 2007) (noting judicial immunity exists for participants in the judicial process, including judges, prosecutors, jury members, parties, counsel, and witnesses).

Insofar as Plaintiff claims Elwell made defamatory statements in any context outside of the civil commitment proceedings, she has not pleaded sufficient facts to meet the standard necessary to survive a motion to dismiss. While she does cite at length the statements in Elwell's reports that she claims were false and defamatory (Am. Compl. at pp. 60-64), she does not identify statements made in any other context, nor identify the recipients of those specific statements. Plaintiff merely states that Dakota County relayed false information to "police, doctors, and government." (*Id.* at pp. 58-59 ¶ 17.) The

Court therefore recommends dismissal with prejudice of any defamation claims against the Dakota County Defendants made in connection with the civil commitment proceedings and dismissal without prejudice for any statements made outside of those proceedings.

Furthermore, even if Plaintiff had pleaded, or could plead, sufficient facts to sustain a claim for defamation under Minnesota law, for the reasons explained below in Section E, this Court recommends dismissal of this claim on the ground that it would not be appropriate to exercise supplemental jurisdiction over this state law claim if all federal claims against the Dakota County Defendants are dismissed.

### B. Defendants Matthew Smith and the City of Burnsville's Motion to Dismiss

Defendants Matthew Smith and the City of Burnsville have also moved to dismiss the claims against them pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### 1. Plaintiff's Section 1983 Claims Concerning Her Seizure and Commitment

The Burnsville Defendants allege that Plaintiff's § 1983 claims arising out of her seizure and commitment must be dismissed because the *Rooker-Feldman* doctrine deprives the Court of subject matter jurisdiction over any claims inextricably intertwined with the state court's civil commitment decision, because the *Heck* doctrine makes those claims premature, and because she has failed to plead a basis upon which relief can be granted under *Monell* or *Harris*. The Court will address each of those in order.

29

#### i.     *Rooker-Feldman* and *Heck* Arguments

Construed liberally, the Amended Complaint appears to allege both that the Burnsville Defendants lacked probable cause to seize her for an emergency medical hold on August 29, 2013, and that they used excessive force while doing so.  She also alleges that a state court judge civilly committed her based on their false reports.  The Burnsville Defendants argue that *Rooker-Feldman* proscribes not only the claims that her commitment was based on the allegedly false reports from these Defendants, but also the claims arising out of the seizure that preceded the commitment.

For the reasons set forth in Section A.1.i above, the Court agrees that, insofar as Plaintiff's claims against these Defendants arise out of the reports they made and the role those reports may have played in her commitment, those claims, like the false testimony claims against the Dakota County Defendants, are part and parcel of the state court decision to commit her and are therefore barred by *Rooker-Feldman*.

But unlike the claims against the Dakota County Defendants, to the extent the Amended Complaint alleges that the Burnsville Defendants' conduct in seizing her – either the fact of the seizure or the manner in which it was conducted – was in violation of her rights, those claims are independent of and are not inextricably intertwined with the civil commitment proceeding.  The Burnsville Defendants argue *Rooker-Feldman* bars any claims that probable cause was lacking to take her into custody because a state court judge ultimately civilly committed Plaintiff.  Their argument overlooks that they took Plaintiff into custody and placed her on an emergency medical hold *before* the civil commitment proceeding.  In this regard, the Court finds the reasoning in *Doe v. Whelan*,

No. 308-CV-846CSH, 2010 WL 1279069 (D. Conn. Mar. 29, 2010), instructive.  In that

case, the plaintiff sued Connecticut's Department of Children and Families after it

removed her children on a ninety-six hour emergency hold prior to obtaining a court

order.  A state court ultimately issued orders of temporary custody, divesting the plaintiff

of custody of her children.  *Id.* at *3.  The state court applied a preponderance of evidence

standard to the temporary custody proceeding, higher than the probable cause standard

needed to place the children on emergency hold.  *Id.* at *5.  The defendants argued

*Rooker-Feldman* barred the plaintiff's claim that there was no probable cause to issue the

emergency hold because the state court necessarily approved the emergency hold when it

issued the orders of temporary custody under a higher standard.  *Id.*  The court held,

however, that *Rooker-Feldman* did not bar the plaintiff's claims because the plaintiff did

not seek review of the orders of temporary custody, but only argued there was no

probable cause for the emergency hold, an action that was taken prior to the entry of any

court order.  *Id.* at *6-7.  Specifically, she argued her injuries were caused by the

defendants who removed her children based on her status as a domestic violence victim

prior to obtaining a court order, and not by the court that ultimately issued the orders of

temporary custody.  *Id.* at *1.

Similarly, here, because a consideration of whether the Burnsville Defendants had

probable cause to take Plaintiff into custody on August 29, 2013, does not necessarily

implicate the validity of the state court's decision in September 2013 that she should be

committed, *Rooker-Feldman* does not bar this claim.  Moreover, Plaintiff's apparent

separate claim that excessive force was used in detaining her survives *Rooker-Feldman*

31

because the manner in which Plaintiff was treated when she was seized by the Burnsville

Defendants was not the subject of the state court civil commitment proceeding and can be

challenged without necessarily invalidating that order. *See Lawrence v. City of St. Paul*,

740 F. Supp. 2d 1026, 1036 (D. Minn. 2010) (finding *Rooker-Feldman* did not deprive

the court of jurisdiction over excessive force and wrongful seizure claims after the

plaintiff was convicted in state court).

The Burnsville Defendants also argue the *Heck* doctrine renders premature

Plaintiff's claims for damages based on the allegedly unconstitutional commitment. For

similar reasons as those discussed above, the Court agrees that any damages for claims

arising out of her civil commitment are premature and therefore should be dismissed

because her commitment has not been expunged or overturned.[11] But claims arising out

of her allegedly wrongful seizure on August 29, 2013, do not rise or fall with the validity

of her later civil commitments, and therefore the Court cannot conclude they are

premature under *Heck*. *See Colbert v. City of Monticello, Ark.*, 775 F.3d 1006, 1008

(8th Cir. 2014) (*Heck* did not bar claims of excessive force because these claims did not

necessarily imply the invalidity of a state court conviction); *Moore v. Sims*, 200 F.3d

1170, 1172 (8th Cir. 2000) (*Heck* did not bar claims in which a plaintiff argued there was

---

[11] Plaintiff appears to argue that neither *Rooker-Feldman* nor *Heck* can apply to bar her
claims against the Burnsville Defendants because they were not parties to the state court
civil commitment proceedings. (Pl.'s Mem. Opp'n Burnsville Defs.' Mot. Dismiss at 3
[Doc. No. 122].) However, the *parties* need not be the same for *Rooker-Feldman* to
apply so long as the *claims* are "inextricably intertwined" with claims adjudicated in state
court. *Lemonds v. St. Louis County*, 222 F.3d 488, 492-93 (8th Cir. 2000). Similarly, the
lack of identity among the parties does not make the *Heck* doctrine inapplicable here. As
the Supreme Court stated, the target of the suit does not matter if success "would
necessarily determine the invalidity of confinement." *Wilkinson*, 544 U.S. at 82.

no probable cause for seizure because finding the initial seizure to be without probable cause would not necessarily imply the invalidity of his ultimate drug possession conviction).

The Court thus recommends dismissal of Plaintiff's claims that the Burnsville Defendants' allegedly false or wrongful reports led to her civil commitment for lack of subject matter jurisdiction under *Rooker-Feldman* or, in the alternative, for failure to state a claim under *Heck*.  The Court does not recommend dismissal on these grounds as to Plaintiff's claims that she was wrongfully seized or that Sergeant Smith used excessive force on August 29, 2013.[12]

### ii.        Failure to State a Claim Under *Monell* and *Harris*

The Burnsville Defendants argue that even if Plaintiff's § 1983 claims do not fail under the *Rooker-Feldman* or *Heck* doctrines, they must be dismissed because they fail to state a claim for *Monell* or *Harris* liability.  The Court notes at the outset that the claims in Plaintiff's Amended Complaint against Smith are no more explicit with regard to individual capacity than her claims against Elwell.  Therefore, the Court finds that Smith, like Elwell, was sued only in his official capacity.  Accordingly, Plaintiff's claims are "deemed to be a suit against the employer only."  *Lopez-Buric v. Notch*, 168 F. Supp. 2d 1046, 1049 (D. Minn. 2001), *amended*, No. 00-cv-928 (ADM/RLE), 2001 WL 1488112 (D. Minn. Apr. 25, 2001).  Here, these claims would be against his employer, the City of Burnsville.

---

[12] In light of the conclusions described herein, the Court does not find it necessary to address the Burnsville Defendants' arguments regarding collateral estoppel or immunity under Minnesota Statute § 253B.23, subd. 4.

As previously discussed, one isolated incident is not enough to establish a policy or custom for which the City could be liable.  Plaintiff's allegations against Smith and the City concerning the August 29, 2013, police visit do not establish a policy or custom on the part of the City.  Plaintiff pleaded facts relating only to herself, and those facts related only to one incident in which she alleges officers unreasonably relied on the accusations of another, wrongfully seized Plaintiff, used excessive force, and made a false report against her.  She does not include any allegations sufficient to plead the existence of a policy or custom that bears a causal relationship to that purported wrongful conduct.  Accordingly, Plaintiff's attempt to plead liability under § 1983 against the Burnsville Defendants relating to the events of August 29, 2013, does not state a claim upon which relief can be granted.  Because the Court sees no prospect that Plaintiff could further amend her complaint to sufficiently plead such a claim, the Court recommends that these claims be dismissed with prejudice.

Regarding her *Harris* failure-to-train claim, Plaintiff's claim against the Burnsville Defendants is even more lacking than her *Harris* claim against the Dakota County Defendants.  Plaintiff alleges the Burnsville Defendants conduct "inadequate training in interpersonal communications, basic manners, interactions with the public, habits of inveterate liars, [and] distinguishing gentle citizens from degenerates." (Am. Compl. at p. 19 ¶ 1.)  Plaintiff does not allege identities of any trainers or even any individuals who purportedly received inadequate training.  She sets forth no facts regarding the training itself.  Finally, she has alleged no facts from which a Court could infer that any policymakers acted with deliberate indifference in failing to train their employees.

34

Overall, other than the sentence quoted above, she does not set forth any specific facts or allegations in support of her *Harris* claim.  Therefore, the Court recommends dismissal with prejudice of her *Harris* claim against the Burnsville Defendants.

Plaintiff does allege the Burnsville Defendants have a policy of failing to investigate and criminally prosecute others, in reference to her claim that they willfully failed to prosecute Defendant Runningen.  But "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 767 n.13 (2005) (quotation omitted).  Further, Plaintiff does not have standing to challenge a refusal to prosecute one who has allegedly committed a crime against her.  *See Newman v. Favor*, No. 04-cv-2728 (JNE/RLE), 2006 WL 2255433, at *2 (D. Minn. Aug. 7, 2006).  Liability under § 1983 requires "a *causal link* to, and direct responsibility for, the deprivation of rights."  *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990) (emphasis added).  Thus, regardless of whether Plaintiff adequately pleaded the existence of such a policy on the part of the Burnsville Defendants, it does not state a claim under § 1983 because it does not deprive Plaintiff of a cognizable right.  Therefore, the Court recommends dismissal with prejudice of any claims of failure to prosecute against the Burnsville Defendants or others in this case.

Similarly, Plaintiff's claim that the City of Burnsville has a policy of "failing to utilize GPS/audio/video technology to monitor 24/7 the actions of . . . all police officers for compliance with constitutional/bill of rights guarantees" (Am. Compl. at p. 29 ¶ 37), does not sufficiently identify a right to such monitoring or even that the lack thereof was directly responsible for any alleged deprivation of her rights.  Indeed, by her own

admission, the August 29, 2013, police visit was recorded by audio. (*Id.* at p. 41 ¶ 30.) The Court therefore also recommends dismissal with prejudice of this claim.

### iii.        Individual Capacity Claims Against Smith

As discussed above, Plaintiff sued Smith only in his official capacity and therefore the Court recommends dismissal of the § 1983 claims against his employer because they fail to state a claim for *Monell* or *Harris* liability. Even if the Court were to conclude he had been sued in his individual capacity, however, it would nevertheless recommend dismissal on grounds of qualified immunity with respect to Plaintiff's claim that he violated her rights by taking her into custody for a medical hold.

The Court set forth the standard for qualified immunity above in Section A.1.ii(3). As to Smith, Plaintiff appears to allege that he violated her Fourth Amendment rights by seizing her without probable cause. As already established above, freedom from seizure without probable cause is a valid protected interest. But, a law enforcement officer is entitled to qualified immunity against such a claim if a reasonable officer could have believed his or her conduct was lawful based on the information the officer possessed. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citations omitted); *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). In the mental health seizure context, a showing of probable cause "requires only a 'probability or substantial chance' of dangerous behavior - not an actual showing of dangerous behavior." *Washington v. City of Univ. City*, No. 4:09-CV-0784 HEA, 2012 WL 1134029, at *3 (E.D. Mo. Mar. 31, 2012) *aff'd*, 500 F. App'x 558 (8th Cir. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983)).

For the reasons discussed below, the Court concludes that, accepting the facts pleaded in the Amended Complaint as true and drawing all inferences in favor of Plaintiff, while viewing the facts from the perspective of a reasonable officer, Smith had at least arguable probable cause to seize Plaintiff, and therefore is entitled to qualified immunity. *See Ulrich*, 715 F.3d at 1059; *Shimota v. Wegner*, No. 15-1590 (JRT/FLN), 2016 WL 1254240, at *5 (D. Minn. Mar. 29, 2016).

The Amended Complaint states Runningen called 911 on August 29, 2013, to accuse Plaintiff of knocking on her door with a murderous intent. (Am. Compl. at p. 4 ¶ 13.) Plaintiff argues Smith should not have believed Runningen, but the Amended Complaint acknowledges he was aware of Runningen's statement. Runningen further stated to police that Plaintiff had a hammer, that Runningen was afraid, and that Plaintiff had "mental problems." (*Id.* at p. 5 ¶ 15.) Runningen also told police Plaintiff aimed a hammer at her head but hit the door instead. (*Id.*) When Smith and his fellow officer arrived at her door, Plaintiff states she spoke to them in a friendly manner, stating "Expecting a war? Check upstairs." (*Id.* at p. 37 ¶ 19.) Plaintiff also told them she was uncomfortable with their hostile approach to her door and their use of her first name. (*Id.* at p. 37 ¶¶ 19-20.) She then told the officers, "Quit that expression. You too, just quit it." (*Id.* at p. 37 ¶¶ 20.) After telling the officers she was going to get her keys, she told them "I don't like your attitude." (*Id.* at p. 38 ¶¶ 21.) Plaintiff then tried to give the officers "collateral" in the form of earplugs, bug spray, and coats, to convince them that she was just going to get her keys. (*Id.* at p. 38 ¶¶ 23.)

Those facts are sufficient on their face to show Smith had arguable probable cause to seize Plaintiff.  Smith had a report from Plaintiff's neighbor that Plaintiff attempted to hit her with a hammer and that she had mental health issues.  Plaintiff exhibited bizarre behavior, and although she alleges she was attempting to get her keys, the officers could have reasonably believed she was attempting to retrieve her hammer or another weapon. A reasonable officer in Smith's position could have determined there was probable cause Plaintiff was a danger to herself or others.  The Court therefore finds the Amended Complaint on its face establishes that Smith had qualified immunity in seizing Plaintiff and would recommend dismissal with prejudice of any claims alleging unlawful seizure against him even if he had been sued in his individual capacity.[13]

In addition to Plaintiff's attempted § 1983 claims against Smith, the Amended Complaint includes several allegations against Smith regarding purported indecent acts. Even if, for purposes of this motion, the allegations are taken as true, Plaintiff has not identified, and the Court cannot discern, a cognizable cause of action based on these alleged activities.  The Court therefore recommends dismissal of these claims and, as discussed below in Section C, further recommends that they be stricken.

---

[13] Because the issue has not been fully briefed by the parties, the Court will not address in this Report and Recommendation whether Plaintiff's excessive force claims would be sufficient to survive a challenge under Rule 12(b)(6) if her Amended Complaint had adequately named Smith in his individual capacity.  Nevertheless, the Court recommends dismissal of any excessive force claim without prejudice because Plaintiff has not named Smith in his individual capacity.

## 2.   RICO Claims

Plaintiff attempts to plead federal RICO claims against the Burnsville Defendants, stating she sues under "RICO 18 USC §§ 1961-1968." To state a claim under RICO, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted). "A RICO claim must be pleaded with particularity under Rule 9(b)." *Id.* Here, Plaintiff has not identified any criminal conduct, a RICO enterprise, or any racketeering activity in detail or even in passing mention. Other than the statement of jurisdiction, Plaintiff does not mention RICO again. Because the pleadings fall so far short of the requisite particularity, and because nothing in Plaintiff's responsive memorandum or elsewhere in the record before this Court suggests that facts exist that could establish RICO liability on the part of the Burnsville Defendants, the Court therefore recommends dismissal with prejudice of Plaintiff's attempted RICO claims against the Burnsville Defendants.

## 3.   State Law Claims

### i.   Defamation Claims and Absolute Privilege

Plaintiff alleges the Burnsville Defendants defamed her beginning in 2013. Minnesota Statute § 541.07(1) provides a two-year statute of limitations for defamation claims. This lawsuit was initially filed on August 25, 2015. Any action based on allegedly defamatory or false statements made before August 25, 2013, is thus barred.

As to any alleged defamation occurring after August 25, 2015, the Burnsville Defendants argue Plaintiff's claims are barred by absolute immunity. It is well-settled in

Minnesota that "high-level executive officers are absolutely immune from suit for defamatory statements made during the course of their duties." *Buchanan v. Minn. State Dep't of Health*, 573 N.W.2d 733, 736 (Minn. Ct. App. 1998).  Absolute immunity depends on "the official's assigned functions, whether the statements made were integral to performing those functions, and the public interest furthered by allowing the official to speak freely about the statement's subject matter." *Id.*  The Minnesota Supreme Court has explicitly stated "a police officer has absolute immunity for statements made in an arrest report because it is 'essential to the performance of his function as an officer.'" *Id.* (quoting *Carradine v. State*, 511 N.W.2d 733, 737 (Minn. 1994)).

Here, Plaintiff brings defamation claims against the Burnsville Defendants based on several events.  Plaintiff alleges police defamed her on January 3, 2014, by filing a police report about her.  (Am. Compl. at pp. 23-24 ¶ 14.)  She also claims the Burnsville chief of police defamed her on December 23, 2013, by reporting to Dakota County that she was harassing him with phone calls and letters.  (*Id.* at p. 24 ¶ 15.)  She again alleges police defamed her on January 2, 2014, in a police report.  (*Id.* at p. 24 ¶ 17.)  Plaintiff describes a police report from January 2, 2015, in which she alleges the Burnsville police defamed her to Dakota County.  (*Id.* at pp. 27-28 ¶ 31.)  In every alleged act of defamation, a police officer made the statement, and every statement was made in the course of the officer's official job functions.  The Court therefore recommends dismissing Plaintiff's defamation claims with prejudice.

### ii.        Alleged Violations of Minnesota Criminal Statutes

Plaintiff seeks damages against the Burnsville Defendants for alleged violations of Minnesota Statute § 609.505, subd. 1, which criminalizes a police officer's actions in making a false report.  She also seeks damages under Minnesota Statute § 253B.23, subd. 3, in which a person making false reports resulting in the civil commitment of another may be guilty of a gross misdemeanor.  The former statute does not appear even to apply to the City of Burnsville, and, as the Court concluded above in Section A.2, neither statute, expressly or by clear implication, provides for civil liability, so the Court therefore recommends dismissal of these claims with prejudice.

### iii.        Spoilage and Spoliation

Regarding "spoilage," Plaintiff writes in her responsive memorandum that she is distinguishing between a spoilage claim for damages based on any food spoiled during her allegedly unlawful civil commitment, on one hand, and spoliation of evidence, on the other.  Insofar as Plaintiff seeks damages for spoiled food, the Court recommends dismissal of those claims on the same bases that it recommends dismissal of her other claims for damages allegedly arising out of her commitment.

Plaintiff's attempted cause of action for spoliation of evidence rests on her allegations that the Burnsville Defendants destroyed evidence that would have proved her version of some of the events alleged in her Amended Complaint.  She alleges they destroyed the 911 audio recording from the August 29, 2013, incident that would have proved she did not knock on Runningen's door.  She also alleges they destroyed an audio recording from February 2, 2013, that would have proved police falsified an incident

41

report from that date.  Finally, she alleges the Burnsville Defendants destroyed Smith's

police sedan, preventing her from proving he used that sedan to pursue his vendetta

against her.  Assuming for the sake of argument that the evidence purportedly destroyed

would have assisted her in proving her claims, Minnesota law does not recognize an

independent cause of action for spoliation of evidence.  *See Federated Mut. Ins. Co. v.*

*Litchfield Precision Components, Inc.*, 456 N.W.2d 434, 436 (Minn. 1990).  The Court

therefore recommends dismissal with prejudice of both Plaintiff's spoilage and spoliation

claims.

### iv.        Minnesota Government Data Practices Act

Plaintiff alleges the City of Burnsville violated the MGDPA on several counts.

First, she claims they failed to correct data in the police reports after receiving her

Statements of Disagreement under Minnesota Statute § 13.04.  As explained above, that

statute provides that the determination by a responsible authority to not correct data may

be appealed only to the Commissioner for the Department of Administration.  Minn. Stat.

§ 13.04, subd. 4.  There is no indication in the Amended Complaint that Plaintiff did so.

Because she has apparently failed to exhaust her administrative remedies under the

MGDPA, the Court would recommend dismissal without prejudice of this claim against

the Burnsville Defendants.

Plaintiff also argues the City of Burnsville violated the MGDPA by releasing the

police incident reports, which she claims are private data, and by failing to respond to her

satisfaction to her requests for the name of Officer Smith's "co-conspirator" in the

alleged indecent acts, and the name of the police officer who willfully issued no citation

42

to Runningen.  With respect to the release of the police incident reports, the City argues such reports are not private data under the MGDPA and therefore their release cannot be the basis for a violation of that statute.  The Court addressed the issue of whether police incident reports were private data under the MGDPA in its order denying Plaintiff's motion for sanctions against the Burnsville Defendants for disclosing those reports.  The Court concluded the reports were not private data, and the District Judge affirmed the Court's conclusion on appeal [Doc. No. 215].  For the same reasons described in the Court's previous order, the Court concludes the allegations in Plaintiff's Amended Complaint concerning the release of those incident reports fails to state a cause of action for violation of the MDGPA, and recommends they be dismissed with prejudice.

With respect to Plaintiff's requests for information, the City contends it provided Plaintiff access to records in response to her multiple data requests, and denies there is any responsive record that it has not made available to Plaintiff.  Further, they argue, to the extent any "evidence" sought by Plaintiff has not been recorded, it is not data under the MGDPA.  *See Keezer v. Spickard*, 493 N.W.2d 614, 618 (Minn. Ct. App. 1992).  This Court must view all facts in favor of Plaintiff, however.  At this point in litigation, the Court must take as true that the Burnsville Defendants have not provided Plaintiff existing data in response to her requests, and therefore cannot recommend that the claim be dismissed under Rule 12(b)(6).  However, as explained below in Section E, the Court recommends dismissal of any remaining state claims for lack of original and supplemental jurisdiction.

### C.    Defendants Matthew Smith and the City of Burnsville's Motion to Strike

Under Federal Rule of Civil Procedure 12(f), a court may strike from a pleading any "immaterial, impertinent or scandalous matter."  A court enjoys "liberal discretion" in deciding when to strike matter, but striking pleadings is an extreme measure, and such motions are infrequently granted.  *See Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000).  Motions to strike closely resemble motions to dismiss, and to grant a motion to strike, the court must accept the allegations as true and still find the allegations to be legally insufficient.  *See E.E.O.C. v. Prod. Fabricators, Inc.*, 873 F. Supp. 2d 1093, 1097 (D. Minn. 2012).

The Burnsville Defendants request striking any allegations regarding sexual orientation, public sexual activities, or performing law enforcement activities out of sexual gratification.  The Court recommends granting the motion to strike as to all such allegations.  First, the references to Sergeant Smith's purported sexual orientation, while not scandalous (regardless of whether or not they are true), are utterly immaterial to any cause of action.  As for the references to alleged public sexual activities and performing law enforcement activities out of sexual gratification, these allegations are both impertinent and scandalous, and are immaterial to any cognizable claims in the Amended Complaint.  Plaintiff has not alleged what cause of action these acts create, and the Court cannot guess what cause of action might exist here.[14]  As a result, in this exceptional

---

[14] Even if Plaintiff could and did plead a state law claim, she cannot create § 1983 liability based on such a claim.  *See Myers v. Becker Cty.*, 833 F. Supp. 1424, 1431 (D.

case, the Court recommends that all of the allegations referenced in the Burnsville Defendants' motion to strike be stricken in their entirety. The Court further recommends that the Burnsville Defendants be directed to prepare and submit for the Court's review a proposed redacted amended complaint consistent with this Report and Recommendation.

### D.   Timberland Partners' Motion to Dismiss

Plaintiff has alleged federal claims against Defendant Timberland Partners under § 1983 and RICO, and state claims sounding in defamation, habitability concerns, Minnesota criminal statutes, and spoliation. The claims arise out of a long history of disputes, including Timberland Partners's handling of Plaintiff's complaints about Runningen; many but not all of the disputes were the subject of rent escrow actions in state court during 2014 and 2015 that were previously decided in Timberland Partners's favor. Timberland Partners alleges all of the claims against it should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(e).

### 1.   Section 1983 Claims

Timberland Partners argues that Plaintiff's § 1983 claims against it fail to state a cause of action upon which relief can be granted. Liability under § 1983 exists for defendants acting under color of state law who deprive a plaintiff of a right secured by the laws of the United States. Timberland Partners is a private landlord. "A private party may be held liable under § 1983 only if it is a willful participant in joint activity with the State or its agents." *Gibson v. Regions Fin. Corp.*, 557 F.3d 842, 846 (8th Cir. 2009)

---

Minn. 1993) ("A violation of state law, without more, does not state a claim under the federal Constitution or section 1983.")

(citation omitted).  "[A] plaintiff seeking to hold a private party liable under § 1983 must allege, at the very least, that there was a mutual understanding, or a meeting of the minds, between the private party and the state actor" regarding the violation of a plaintiff's constitutional rights.  *Miller v. Compton*, 122 F.3d 1094, 1098 (8th Cir. 1997) (citations omitted).  In her response to its motion, Plaintiff states Timberland Partners acted together with state actors by "shirking responsibility for unlawful manufacturing business operations carried on by defendant Runningen."  (Pl.'s Mem. Opp'n Timberland Partners' Mot. Dismiss at 4 [Doc. No. 123].)  But neither the Amended Complaint nor this conclusory response identifies facts that connect any alleged failure to act on Timberland Partners's part with willful participation in concert with state actors, or a federal constitutional right that was violated by such alleged inaction.  The Court therefore recommends dismissal with prejudice of Plaintiff's attempted § 1983 claims against Timberland Partners.

## 2.   RICO Claims

Plaintiff attempts to plead federal RICO claims against Timberland Partners.  Plaintiff does not plead any RICO claim with the necessary particularity, however, nor does her response offer any basis to anticipate that facts exist upon which she could plead a plausible RICO claim.  For the same reasons the Court recommended dismissal of RICO claims against the Burnsville Defendants in Section B.2, the Court recommends dismissal with prejudice of Plaintiff's attempted RICO claims against Timberland Partners.

46

### 3.    State Law Claims Relating to Habitability

Timberland Partners argues Plaintiff's state law claims should be dismissed under

*Rooker-Feldman* and on grounds of res judicata and/or collateral estoppel, because these

claims were the subject of two rent escrow actions that were decided in Defendant's favor

in state court.  As already discussed, the *Rooker-Feldman* doctrine bars claims in federal

district court "complaining of injuries caused by state-court judgments rendered before

the federal district court proceedings commenced and inviting district court review and

rejection of those judgments."  As courts in this district have explained, however, "[a]

district court is not deprived of jurisdiction over every case in which a plaintiff seeks a

result different from the one it obtained in state court."  *Christ's Household of Faith*,

618 F. Supp. 2d at 1044 (citing *Skit Int'l*, 487 F.3d at 1157).  Here, Plaintiff's habitability

claims against Timberland Partners do not claim injuries stemming from the state court's

decision in the rent escrow claims, but instead assert claims that (if they exist at all) exist

independently of those state court decisions.  For example, Plaintiff does not claim

injuries stemming from a hypothetical eviction issued by a state court, but rather

complains of injuries stemming from alleged poor living conditions that were in place

before the state court escrow proceedings.  In other words, Plaintiff's claims could be

addressed without necessarily challenging the underlying state court decisions.  As such,

*Rooker-Feldman* does not preclude jurisdiction over the habitability claims.

The Court finds *Rooker-Feldman* does bar Plaintiff's perjury claims, however.

Plaintiff claims Timberland Partners committed perjury during the rent escrow actions,

and as a result, she has suffered "court preparation expenses, pain and suffering, mental

anguish and defamation in her efforts to obtain jobs, housing, and anything else requiring a background check." (Am. Compl. at p. 13 ¶ 18.) Plaintiff's alleged injuries directly stem from the court order resulting from proceedings in which Timberland Partners presented evidence, and it is that evidence Plaintiff contends was false. But the state court necessarily considered and determined for itself the credibility of that evidence when it reached its decisions in the rent escrow actions. Therefore Plaintiff's claims of perjury are barred for the same reasons Plaintiff's claims of false testimony against Defendant Elwell, discussed above in Section A.1.i are barred, and should therefore be dismissed for lack of federal subject matter jurisdiction.

Timberland Partners argues in the alternative that some of Plaintiff's claims are barred by res judicata principles. In ascertaining the preclusive effect of a judgment, "[t]he law of the forum that rendered the first judgment controls the res judicata analysis." *St. Jude Med. S. C., Inc. v. Cormier*, 745 F.3d 325, 327 (8th Cir. 2014) (quotations omitted). Under Minnesota law, res judicata applies when "(1) the earlier claim involved the same set of factual circumstances; (2) the earlier claim involved the same parties or their privies; (3) there was a final judgment on the merits; (4) the estopped party had a full and fair opportunity to litigate the matter." *Hauschildt v. Beckingham*, 686 N.W.2d 829, 840 (Minn. 2004). "Res judicata not only applies to all claims actually litigated, but to all claims that could have been litigated in the earlier action." *Id.*

Timberland Partners also argues collateral estoppel, or issue preclusion, bars some of Plaintiff's claims. For collateral estoppel to apply:

48

(1) the issue must be identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or was in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Hauschildt*, 686 N.W.2d at 837.  "The issue on which collateral estoppel is to be applied must be the same as that adjudicated in the prior action and it must have been necessary and essential to the resulting judgment in that action."  *Id.*

Thus, to determine whether any or all of Plaintiff's claims, or any of the issues underlying those claims, are barred by res judicata or collateral estoppel, it is necessary first to examine the extent to which the factual circumstances and issues raised by Plaintiff's Amended Complaint overlap with the matters litigated in Plaintiff's 2014 and 2015 rent escrow actions.  The Amended Complaint asserts claims against Timberland Partners based on utilities apportionment under Minnesota Statute § 504A.215.  (Am. Compl. at p. 12 ¶¶ 16-17.)  The state court addressed this issue in the 2014 and 2015 rent escrow actions.  That court held that Plaintiff consented to apportioning of utility charges when she signed the addendum to her lease agreement because she already suspected Runningen was running a business from her apartment, but also directed Timberland Partners to provide Plaintiff copies of apportioned bills.  (*See* Nelson Aff. Ex. 2 at 5 (Am. Findings of Fact, Conclusions of Law and Order, *Liedtke v. Timberland Partners*, Case No. 19AV-CV-14-468 (1st Jud. Dist. Minn., June 20, 2014) [Doc. No. 93]; Nelson Aff. Ex.  4 at 10-11 (Findings of Fact, Conclusions of Law and Order, *Liedtke v. Timberland Partners*, Case No. 19AV-CV-15-663 (1st Jud. Dist. Minn., March 27, 2015)) [Doc. No. 93].)  Thus, this issue was fully litigated and resolved in the rent escrow actions.

Plaintiff also appears to allege her apartment was rendered uninhabitable because Timberland Partners allowed "indecency in vehicles" to occur. (Am. Compl. at p. 17 ¶ 32.) But this claim, too, was addressed by the state court, which determined these purported acts did not affect the habitability of her apartment. (*See* Nelson Aff. Ex. 4 at 9 [Doc. No. 93].) The Amended Complaint also sets forth a number of allegations concerning noise and odors related to her neighbor Runningen's use of her apartment that purportedly affected the habitability of Plaintiff's own apartment. (Am. Compl. at pp. 14-17 ¶¶ 22-24, 26-27.) The state court addressed these issues in the 2014 state escrow action. (*See* Nelson Aff. Ex. 2 at 5 [Doc. No. 93].) The state court directed Timberland Partners to make reasonable accommodations to ensure Plaintiff was not disturbed by the business operating in the apartment above her. (*Id.* at 6.) The court further ordered Timberland Partners to reduce Plaintiff's rent until it resolved her concerns regarding the noise created by the resident living in the apartment above her, Runningen. (*Id.* at 7.) Notably, Plaintiff claims that in mid-June 2014, Runningen moved to a different apartment in the same building. (Am. Compl. at p. 17 ¶ 33.)

In short, many of Plaintiff's current claims against Timberland Partners raise the same issues, and arise out of the same factual circumstances, that were litigated in her 2014 and 2015 rent escrow actions. Except to the extent Plaintiff alleges new claims arising out of facts that were not the subject of the state court actions (for example, events or circumstances that post-date the state court actions), the first factor for both res judicata and collateral estoppel is satisfied.

The next requirement is that the parties, or their privies, be the same as the previous litigation.  "Privity includes 'those who control an action although not parties to it; those whose interests are represented by a party to the action; [and] successors in interest to those having derivative claims.'"  *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1153 (8th Cir. 2012) (quoting *Margo–Kraft Distribs., Inc. v. Minneapolis Gas Co.*, 294 Minn. 274, 200 N.W.2d 45, 47-48 (1972)).  There is no question that Timberland Partners was the defendant in those actions, just as it is the target of Plaintiff's habitability claims here, so the privity requirement is satisfied.

The third required element is that there was a final judgment on the merits. A judgment is on the merits when judgment is entered and the time for appeal from that judgment has expired.  *See Brown-Wilbert, Inc. v. Copeland Buhl & Co., P.L.L.P.*, 732 N.W.2d 209, 221 (Minn. 2007).  "A judgment is final when it is entered in the district court and it remains final, despite a pending appeal, until it is reversed, vacated or otherwise modified."  *Id.*  Here, in both rent escrow actions from 2014 and 2015 the court issued Findings of Fact, Conclusions of Law and Order.  The 2015 rent escrow action final judgment was entered on April 6, 2015.  (*See* Nelson Aff. Ex. 5 at 1 (Notice of Appeal, *Liedtke v. Timberland Partners*, Case No. 19AV-CV-15-663 (Minn. Ct. App. June 24, 2015)) [Doc. No. 93].)  Plaintiff appealed this decision to the Minnesota Court of Appeals on June 24, 2015.  (*Id.*)  That court denied her *in forma pauperis* application and directed her to pay the filing fee.  (*See* Nelson Aff. Ex. 6 at 4 (Order, *Liedtke v. Timberland Partners*, Case No. 19AV-CV-15-663 (Minn. Ct. App. July 10, 2015)) [Doc. No. 93].)  Because Plaintiff already appealed this decision to the Minnesota Court of

Appeals and the state court entered the rent escrow action, the Court finds the third element to be met.

The fourth and final element requires the estopped party to have had a full and fair opportunity to litigate. In analyzing this element, courts consider "whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties." *State v. Joseph*, 636 N.W.2d 322, 328 (Minn. 2001). "[A] litigant's disagreement with a legal ruling does not necessarily mean that the court denied the litigant a full and fair opportunity to litigate a matter." *Id.* at 329. Here, there is no evidence that Plaintiff's ability to present her case was constrained by procedural limitations. In both instances the state court held a trial, one for one day and the second over three days. (*See* Nelson Aff. Ex. 2 at 1 [Doc. No. 93]; Nelson Aff. Ex. 4 at 1 [Doc. No. 93].) Both sides presented evidence, although Plaintiff claimed in her appeal to the Minnesota Court of Appeals that the lower court determined some of her evidence to be inadmissible. (*See* Nelson Aff. Ex. 5 at 4-6 [Doc. No. 93].) Additionally, Plaintiff had an incentive to fully litigate her claims, and the relationship between the parties did not limit effective litigation. The Court finds the fourth element to be met.

In sum, Plaintiff's claims against Timberland Partners for disturbances related to Runningen's business, claims that Timberland Partners violated utilities allocation regulations, and claims of indecency in the parking lot were litigated, and are therefore barred by res judicata and collateral estoppel. The Court therefore recommends dismissal of those claims with prejudice.

However, Plaintiff also appears to assert claims that were not and could not have been litigated during either the 2014 or 2015 rent escrow action.  For example, Plaintiff brings a claim based on brown mold in her apartment that occurred in July 2015.  (Am. Compl. at p. 13 ¶ 19.)  Plaintiff also brings additional claims against Timberland Partners for the actions of other tenants, who have allegedly caused her loss of quiet enjoyment. (*Id.* at 16-17 ¶¶ 28-31.)  It is not clear when these actions occurred, or whether they were or could have been litigated in the 2014 or 2015 rent escrow actions, so it is unclear whether res judicata or collateral estoppel bars them.  "The party asserting collateral estoppel has the burden to establish that 'the issue was actually presented and necessarily determined in the earlier action.'"  *Mach v. Wells Concrete Products Co.*, 866 N.W.2d 921, 927 (Minn. 2015) (quoting *Lange v. City of Byron*, 255 N.W.2d 226, 228 (Minn. 1977)).  The party asserting res judicata also has the burden of proof.  *See Hintz v. JPMorgan Chase Bank, N.A.*, 686 F.3d 505, 509 (8th Cir. 2012).  Granted, Plaintiff's lack of specificity in stating the precise nature of her claims makes it nearly impossible for Timberland or for this Court to tease out what claims may yet survive.  Nevertheless, because it is not clear that claims regarding brown mold and disturbances by other tenants are barred by res judicata or collateral estoppel, the Court cannot recommend dismissal of those particular claims under these doctrines.

### 4.    Alleged Violations of Minnesota Criminal Statutes

Plaintiff seeks damages against Timberland Partners for alleged violations of Minnesota Statute § 609.505, subd. 1, which criminalizes a police officer's actions in making a false report.  She also seeks damages under Minnesota Statute § 253B.23, subd.

3, in which a person making false reports resulting in the civil commitment of another may be guilty of a gross misdemeanor.  The former statute does not appear even to apply to Timberland Partners, and, as the Court concluded above in Section A.2, neither statute, expressly or by clear implication, provides for civil liability, so the Court therefore recommends dismissal of these claims with prejudice.

### 5. Spoliation

Plaintiff brings spoliation claims against Timberland Partners for destroying "evidence in their paper files and on their computer system in anticipation of this plaintiff's lawsuit to prevent plaintiff from being able to prove her claims."  (Am. Compl. at p. 18 ¶ 35.)  As already explained, spoliation is not an independent cause of action under Minnesota law.  Accordingly, the Court recommends dismissal with prejudice of her spoliation claims against this Defendant.

### 6. Agency/Principal Claims

Plaintiff alleges she entered into an "agent" relationship with "principal" Timberland Partners to "negotiate noise reduction" with Runningen.  Plaintiff contends Timberland Partners misrepresented Runningen's character, putting her in a dangerous situation.  Viewing her Amended Complaint liberally, the Court assumes Plaintiff is alleging a breach of agency/principal relationship.  Timberland Partners did not address this claim other than generally stating it failed to state a plausible claim.

Plaintiff does not further elaborate on this agency/principal claim, so the Court assumes she is alleging a breach of the duty of good faith found in a relationship between fiduciaries.  *See Thomas B. Olson & Associates, P.A. v. Leffert, Jay & Polglaze, P.A.*,

756 N.W.2d 907, 914 (Minn. Ct. App. 2008) (noting that in fiduciary relationships the parties owe each other a duty of good faith).   In Minnesota, a fiduciary relationship is characterized by a "fiduciary who enjoys a superior position in terms of knowledge and authority and in whom the other party places a high level of trust and confidence." *Carlson v. SALA Architects, Inc.*, 732 N.W.2d 324, 330 (Minn. Ct. App. 2007) (citation omitted).   These relationships "transcend[] the ordinary business relationship," and are strictly construed.   *Id.* at 331 (noting that Minnesota has declined to classify even the physician-patient relationship as fiduciary).

To establish a breach of fiduciary duty claim, a plaintiff must prove the existence of a fiduciary duty, breach of that duty, causation and damages.   *Conwed Corp. v. Employers Reinsurance Corp.*, 816 F.Supp. 1360, 1362 n.3 (D. Minn. 1993).   Evidence of business experience disparities, financial control, repeated assurances, and invited confidences may suffice to show a fiduciary relationship.   *Kennedy v. Flo-Tronics, Inc.*, 143 N.W.2d 827, 830 (Minn. 1966); *Gibson v. Coldwell Banker Burnet*, 659 N.W.2d 782, 788 (Minn. Ct. App. 2003).   However, a fiduciary relationship does not exist by one party merely having faith and confidence in another where the former should have known the latter was representing an adverse interest.   *S. Minn. Mun. Power Agency v. City of St. Peter*, 433 N.W.2d 463, 468 (Minn. Ct. App. 1988).

In this case, Plaintiff has not alleged sufficient facts to support a reasonable inference that she was in a fiduciary relationship with Timberland Partners.   While Plaintiff terms her relationship with Timberland Partners as one of agency/principal, the facts in her Amended Complaint do not allow one to reasonably infer this specific legal

relationship, and there is no basis in her response or elsewhere in the record to suspect such facts exist.  Moreover, even if she had adequately alleged a fiduciary relationship, she did not allege sufficient facts to establish that the relationship or the circumstances imposed on Timberland Partners a duty to inform Plaintiff of Runningen's character, or to establish how the alleged breach of such a duty caused harm to Plaintiff.  Therefore, to the extent any such claims are not barred by the previous state court proceedings between Plaintiff and Timberland Partners, the Court also recommends dismissal of this claim without prejudice for failure to state a claim upon which relief can be granted.

### 7.      Defamation Claims

Plaintiff alleges Timberland Partners defamed her in a January 2, 2014, report it made to the Attorney General and to the County Environmental Pollution Control Management.  (Am. Compl. at p. 18 ¶ 34.)  As explained above, in Minnesota, a plaintiff must plead the defamatory statements verbatim.  Plaintiff has not done so, and the Court recommends dismissal of this claim without prejudice.

### E.      No Pendent Jurisdiction Over State Law Claims

Plaintiff argues pendent jurisdiction under 28 U.S.C. § 1367 is another source of federal jurisdiction over her state law claims against each of the Defendants in this case. 28 U.S.C. § 1367 gives federal courts supplemental jurisdiction in cases where district courts have original jurisdiction and other claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  If a court dismisses all claims over which it has original jurisdiction, § 1367(c) gives courts discretion in

determining whether to exercise supplemental jurisdiction. "In determining whether to exercise supplemental jurisdiction, courts consider judicial efficiency, convenience, and fairness to litigators." *Magee*, 957 F. Supp. 2d at 1060. "In assessing efficiency, convenience, and fairness, courts look to a number of factors, including the stage of the litigation; the difficulty of the state claim; the amount of time and energy necessary for the claim's resolution; and the availability of a state forum." *Id.* (quotation omitted). "Courts should exercise judicial restraint and avoid state law issues wherever possible," especially "when federal claims are dismissed before trial." *Id.* (citations omitted).

Here, the Court has recommended dismissal of all of Plaintiff's federal claims against the Dakota County Defendants and Timberland Partners. The Court has further recommended dismissal for lack of subject matter jurisdiction or dismissal with prejudice for failure to state a claim of all but one of Plaintiff's federal claims against the Burnsville Defendants, the only exception being the claim against Officer Smith for use of excessive force, which the Court recommended be dismissed without prejudice for failure to state a claim against Officer Smith in his individual capacity.

The Court has also recommended dismissal with prejudice of a number of Plaintiff's attempted state law claims, specifically,

- her claims that the Dakota County Defendants violated Minnesota Statutes § 609.505, subd. 1 and § 253B.23, subd. 3 by making false representations about her (Am. Compl. at p. 59 ¶ 20), and that Elwell violated the same statutes for falsely calling the police, (*id.* at p. 60 ¶ 3);

- her claims that the Burnsville Defendants defamed her *(see, e.g.*, *id.* at pp. 23-24 ¶ 14), that they violated the MGDPA by releasing the police incident reports *(see, e.g.*, *id.* at p. 31 ¶ 48), and that they violated Minnesota Statutes § 609.505, subd. 1 and § 253B.23, subd. 3 by willfully harming her (*id.* at p. 32 ¶ 50; p. 45 ¶ 40); and

- her claims that Timberland Partners violated Minnesota Statutes § 609.505, subd. 1 and § 253B.23, subd. 3 for communications with the police (*id.* at p. 12 ¶ 14), violated Minnesota Statutes § 504B.215 and § 504B.161 for failing to provide a utilities allocation to her (*id.* at p. 12 ¶ 17), violated city ordinances by not prohibiting Runningen from committing noise violations and by allowing Runningen to operate a business (*id.* at p. 14 ¶¶ 23, 26), violated the fire code by allowing Runningen to operate her fish tank (*id.* at p. 14 ¶ 24), and generally failed to provide a habitable residence (insofar as her claims were addressed in the 2014 and 2015 rent escrow actions).

Thus, if this Report and Recommendation is adopted, Plaintiff's only surviving state law claims would be certain claims under the MGDPA against the Dakota County Defendants and the Burnsville Defendants, and certain post-escrow action habitability claims against Timberland Partners.[15]  The remaining state law claims are not so closely

---

[15] In her response memoranda, Plaintiff further characterizes her state law claims to include "agency/principal, lease-violation torts, indemnification, criminal statutory violations, defamation, spoliation," "torts, [and] fraud."  (Pl.'s Mem. Opp. Timberland Partners' Mot. Dismiss at 1, 3.). To the extent they have been pleaded in any discernible fashion, the Court has addressed them on the merits in this Report and Recommendation;

related as to form part of the same "case or controversy."  And, judicial efficiency would

not be served by retaining those claims in federal court.  Discovery has not yet begun;

indeed, several Defendants have not yet answered, instead filing these motions to

dismiss, and there are other pending motions to dismiss yet to be decided.  And, state

court is far more familiar with the remaining issues raised by Plaintiff, such as the

disputes with her landlord.  Accordingly, the Court recommends that the District Court

decline to exercise supplemental jurisdiction over any state law claims that may survive.

## III.   RECOMMENDATION

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Dakota County and Angela Elwell's Motion to Dismiss [Doc. No. 52] be

   **GRANTED**, in that:

   a. Plaintiff's federal law claims be **DISMISSED WITH PREJUDICE**;

   b. Plaintiff's state law claims for violations of Minnesota Statute § 609.505,

      subd. 1, Minnesota Statute § 253B.23, subd. 3, and defamation claims of

      statements made during the civil commitment proceedings, be

      **DISMISSED WITH PREJUDICE**; and

   c. Plaintiff's state law claims that Dakota County has not provided her with all

      the information she requested under the MGDPA, any failure of Dakota

      County to correct records under the MGDPA, and defamation claims of

---

however, Plaintiff cannot add new claims to her Amended Complaint through her
response to a motion to dismiss.

statements made outside the civil commitment proceedings be

**DISMISSED WITHOUT PREJUDICE.**

2. Defendants Matthew Smith and the City of Burnsville's Motion to Dismiss [Doc. No. 81] be **GRANTED**, in that:

    a. Plaintiff's federal law claims, except the claim against Officer Smith for use of excessive force, be **DISMISSED WITH PREJUDICE,** and that the claim against Officer Smith for use of excessive force be **DISMISSED WITHOUT PREJUDICE**;

    b. Plaintiff's state law claims for violations of Minnesota Statute § 609.505, subd. 1, Minnesota Statute § 253B.23, subd. 3, spoliation, and defamation, be **DISMISSED WITH PREJUDICE**; and

    c. Plaintiff's state law claim that the Burnsville Defendants have not provided her with all the information she requested under the MGDPA and any failure of the Burnsville Defendants to correct records under the MGDPA be **DISMISSED WITHOUT PREJUDICE**.

3. Defendants Matthew Smith and the City of Burnsville's Motion to Strike [Doc. No. 85] be **GRANTED**, and Burnsville Defendants are directed to submit a proposed redacted amended complaint directly to the Court; and

4. Timberland Partners' Motion to Dismiss [Doc. No. 90] be **GRANTED**, in that:

    a. Plaintiff's federal law claims be **DISMISSED WITH PREJUDICE**; and

    b. Plaintiff's state law claims including habitability claims that were addressed in the 2014 and 2015 rent escrow actions, violations of

Minnesota Statute § 609.505, subd. 1, Minnesota Statute § 253B.23, subd.

3, spoliation, be **DISMISSED WITH PREJUDICE**; and

c. Plaintiff's state law claims of defamation, habitability claims that were not

addressed in the 2014 and 2015 rent escrow actions, and agency/principal

be **DISMISSED WITHOUT PREJUDICE**.


Dated: June 20, 2016                   _s/ Hildy Bowbeer_____
                                       HILDY BOWBEER
                                       United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.